**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| VANDA PHARMACEUTICALS INC.,<br>Plaintiff,<br>v.<br>FOOD AND DRUG ADMINISTRATION et al.,<br>Defendants. | No. 1:24-cv-351-ACR |

**PLAINTIFF'S COMBINED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTIONS TO DISMISS IN PART AND FOR SUMMARY JUDGMENT**

Paul W. Hughes (D.C. Bar No. 997235)
Sarah P. Hogarth (D.C. Bar No. 1033884)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

*Attorneys for Plaintiff*
*Vanda Pharmaceuticals Inc.*

**ORAL ARGUMENT SCHEDULED: SEPTEMBER 17, 2024, at 10:30 AM**

## TABLE OF CONTENTS

Table of Authorities ........ ii

Glossary of Abbreviations ........ vii

Introduction ........ 1

Argument ........ 3

A. Vanda's claims are within the statute of limitations. ........ 3

B. FDA's delays and the regulations that facilitate them are unlawful and may not be applied to Vanda. ........ 8

1. The FDCA requires an approval or NOOH within 180 days. ........ 9

2. Section 355(c)(1) was not impliedly repealed or amended by PDUFA. ........ 10

a. PDUFA enacted a funding mechanism to help reduce FDA's violations of statutory deadlines, not to override them. ........ 10

b. PDUFA did not impliedly repeal Section 355(c)(1) nor effect industry "agreement" that Section 355(c)(1) is a dead letter. ........ 12

3. FDA's regulations contravene Section 355(c)(1)'s 180-day deadline and are thus unlawful. ........ 20

a. FDA's 60-day filing regulation is contrary to the FDCA. ........ 20

b. FDA's CRL regulations are inconsistent with Section 355(c)(1). ........ 28

i. FDA can provide "initial feedback" within the review period but still must provide an NOOH within 180 days of submission. ........ 30

ii. FDA cannot unilaterally dictate an applicant's agreement to extend its review period. ........ 33

iii. The CRL rules prevent an applicant from receiving an NOOH within the 180 days. ........ 36

C. A declaratory-relief remedy is imperative. ........ 38

Conclusion ........ 42

## TABLE OF AUTHORITIES*

**Cases**

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013)....39

*Am. Bus Ass'n v. Slater*,
231 F.3d 1 (D.C. Cir. 2000)....17

*Am. Scholastic TV Programming Found. v. FCC*,
46 F.3d 1173 (D.C. Cir. 1995)....8

*In re Barr Lab'ys, Inc.*,
930 F.2d 72 (D.C. Cir. 1991)....9, 11, 38, 41

*Bob Jones Univ. v. United States*,
461 U.S. 574 (1983)....20, 26

*Centra Med. Grp., LLC v. USCIS*,
2022 WL 910348 (D.D.C. Mar. 29, 2022)....39

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010)....5, 6, 8

*City of Houston, Tex. v. Dep't of Hous. & Urb. Dev.*,
24 F.3d 1421 (D.C. Cir. 1994)....39

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
144 S. Ct. 2440 (2024)....3, 5

**Del Monte Fresh Produce Co. v. United States*,
570 F.3d 316 (D.C. Cir. 2009)....38, 39, 40

*Durovic v. Richardson*,
479 F.2d 242 (7th Cir. 1973)....25

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)....15

*Genuine Parts Co. v. Envtl. Prot. Agency*,
890 F.3d 304 (D.C. Cir. 2018)....6

*Jones v. Changsila*,
271 F. Supp. 3d 9 (D.D.C. 2017)....7

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*,
74 F.3d 1308 (D.C. Cir. 1996)....40

**Loper Bright Enters. v. Raimondo*,
144 S. Ct. 2244 (2024)....9, 10, 16, 19, 20, 21, 22, 25, 26, 29

*Lorillard v. Pons*,
434 U.S. 575 (1978)....24, 27

* Authorities marked with an asterisk are those on which we chiefly rely.

**Cases—continued**

*Lutheran Church-Missouri Synod v. FCC*,
154 F.3d 487 (D.C. Cir. 1998) ....................39

*Maine Community Health Options v. United States*,
590 U.S. 296 (2020) ....................10, 12, 13

*Morton v. Mancari*,
417 U.S. 535 (1974) ....................10, 12, 13, 15

*NAACP v. DeVos*,
485 F. Supp. 3d 136 (D.D.C. 2020) ....................29

*Nat'l Air Transp. Ass'n v. McArtor*,
866 F.2d 483 (D.C. Cir. 1989) ....................5

*Newport Pharms. Int'l Inc. v. Schweiker*,
1981 WL 768924 (D.D.C. Dec. 2, 1981) ....................25

*NLRB Union v. Fed. Labor Relations Auth.*,
834 F.2d 191 (D.C. Cir. 1987) ....................6

*Norton v. Southern Utah Wilderness Alliance*,
542 U.S. 55 (2004) ....................41

*Orion Reserves Ltd. P'ship v. Salazar*,
553 F.3d 697 (D.C. Cir. 2009) ....................29

*PETA v. Gittens*,
396 F. 3d 416 (D.C. Cir. 2005) ....................41

*Plunkett v. Castro*,
67 F. Supp. 3d 1 (D.D.C. 2014) ....................6

*Posadas v. Nat'l City Bank of N.Y.*,
296 U.S. 497 (1936) ....................13

*Rapanos v. United States*,
547 U.S. 715 (2006) ....................20, 26, 28

**Sandoz, Inc. v. Leavitt*,
427 F. Supp. 2d 29 (D.D.C. 2006) ....................2, 9, 10, 11, 13-16, 19, 20, 41

*Sandpiper Residents Ass'n v. U.S. Dep't of Hous. & Urban Dev.*,
106 F. 4th 1134 (D.C. Cir. 2024) ....................16

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
531 U.S. 159 (2001) ....................21, 26

*Udall v. Tallman*,
380 U.S. 1 (1965) ....................25

*United Bhd. of Carpenters & Joiners of Am. v. Operative Plasterers' & Cement Masons' Int'l Ass'n*,
721 F.3d 678 (D.C. Cir. 2013) ....................40

*United States v. Bailey*,
2023 WL 2139365 (D.D.C. Feb. 21, 2023) ....................17

**Cases—continued**

*United States v. Honeywell Int'l Inc.*,
47 F. 4th 805 (D.C. Cir. 2022) ....................34

*United States v. Rutherford*,
442 U.S. 544 (1979) ....................25

*United States v. Salerno*,
481 U.S. 739 (1987) ....................5

**Vanda Pharms., Inc. v. FDA*,
2024 WL 307387 (D.D.C. Jan. 26, 2024) ....................1, 9, 22, 34, 36, 40, 41, 42

**Weaver v. Fed. Motor Carrier Safety Admin.*,
744 F.3d 142 (D.C. Cir. 2014) ....................3, 5, 6, 7, 8

**Statutes**

5 U.S.C.
§ 551(13) ....................8
§ 706 ....................8, 38
§ 706(1) ....................8

21 U.S.C.
§ 355 ....................9, 17
§ 355(a) ....................21
§ 355(b) ....................17
§ 355(b) ....................22, 23
§ 355(b)(1) ....................9, 21
§ 355(b)(1)(A) ....................22, 27
§ 355(c) ....................13, 14
*§ 355(c)(1) .................... *passim*
§ 355(c)(1)(B) ....................1, 21, 32, 41
§ 355(d) ....................23, 24, 27, 28
§ 355(j) ....................31
§ 360n(a)(1) ....................31
§ 379(a)(1) ....................15
§ 379g ....................11
§ 379h-2(c)(1) ....................14
§ 379h-2(f) ....................12, 18
§ 379h(a) ....................11
§ 379h(b) ....................12, 17
§ 379h(c) ....................17
§ 379h(c)(3)(A) ....................18
§ 379h(c)(3)(B) ....................18
§ 379h(c)(3)(C) ....................18
§ 379j-41(9)(B)(ii) ....................31

28 U.S.C. § 2201 ....................8

35 U.S.C. § 156 ....................27

**Statutes—continued**

Prescription Drug User Fee Amendments of 2022,
Pub. L. No. 117-180, 136 Stat. 2140 ....12

Prescription Drug User Fee Act of 1992,
Pub. L. No. 102-571, 106 Stat. 4491 (Oct. 29, 1992) .... 1, 2, 11-13

Pub. L. No. 98-417, 98 Stat. 1585 (1984)....27

**Regulations**

21 C.F.R.
§ 2.110 (1941)....24, 27
§ 130.5 (1975)....24, 27
§ 314.100....36
§ 314.100(a) ....29, 32
§ 314.100(c) ....32, 37
§ 314.100(c)(1) ....1
§ 314.101(a) ....9
§ 314.101(a)(1) ....20, 23, 31
§ 314.101(a)(2) ....1, 22, 23
§ 314.101(a)(3) ....22
§ 314.105....29
§ 314.110....4, 24, 27, 29
§ 314.110(b)....4, 33
§ 314.110(b)(3) ....1, 29, 31, 36
§ 314.110(c) ....33

3 Fed. Reg. 3,161 (Dec. 28, 1938)....24, 27

6 Fed. Reg. 1,920 (Apr. 15, 1941) ....24, 27

21 Fed. Reg. 5,576 (July 25, 1956)....24, 27

28 Fed. Reg. 6,377 (June 20, 1962) ....30

39 Fed. Reg. 11,680 (Mar. 29, 1974)....24, 26, 27

Applications for Approval to Market a New Drug; Complete Response Letter,
73 Fed. Reg. 39,588 (July 10, 2008)....37

New Drug and Antibiotic Regulations, 47 Fed. Reg. 46,622 (Oct. 19, 1982)....24

**Other Authorities**

138 Cong. Rec. 26,928 (Sept. 22, 1992)....11

*Agreement*, Black's Law Dictionary (11th ed. 2019) ....33

*Agreement*, Black's Law Dictionary (Deluxe 4th ed. 1957)....33

*Agreement*, Webster's New World Dictionary, College Edition 29 (1962) ....34

The Chicago Manual of Style (15th ed. 2003)....17

Fed. R. Civ. P.
8(e) ....7
15(a)(2) ....7

**Other Authorities—continued**

*File*, Webster's Third New International Dictionary 849 (1986) ....................21

H.R. Rep. No. 98-857, 1984 U.S.C.C.A.N. 2647, 2677 ....................28

H.R. Rep. No. 102-895 (Sept. 22, 1992)....................11

*Mutual*, Black's Law Dictionary (11th ed. 2019) ....................33

Restatement (Second) of Contracts § 17 (1981) ....................34

*Unilateral*, Black's Law Dictionary (11th ed. 2019) ....................33

## GLOSSARY OF ABBREVIATIONS

**APA:** Administrative Procedure Act

**CRL:** complete response letter

**FDA:** Food and Drug Administration

**FDCA:** Federal Food, Drug, and Cosmetic Act

**NDA:** new drug application

**NOOH:** Notice of an opportunity for a hearing (21 U.S.C. § 355(c)(1)(B))

**sNDA:** supplemental new drug application

**PDUFA:** Prescription Drug User Fee Act

## INTRODUCTION

To ensure critical therapies reach the patients who need them, Congress issued FDA a straightforward mandate: "Within one hundred and eighty days after the filing of [a new drug] application," it "shall either (A) approve the application … or (B) give the applicant notice of an opportunity for a hearing." 21 U.S.C. § 355(c)(1). And if it issues such a notice, the hearing "shall" commence in "not more than" 120 more days. *Id*. § 355(c)(1)(B). But according to FDA, Congress did not mean what it said. By FDA's accounting, 180 days means at least 360 days—or, as was the case here, 400 days.

On its way to violating Congress's mandatory deadline, FDA relies on its own regulations that unlawfully extend or entirely suspend the agency's statutory obligation to approve a drug application or issue a notice of opportunity for a hearing (NOOH) within 180 days. The agency grants itself an extra 60 days on the front end by deeming that applications are not "filed" until "60 days after the date FDA receive[s] the NDA." 21 C.F.R. § 314.101(a)(2). It then stalls issuing the NOOH with a "complete response letter" (CRL), insisting unilaterally that the "applicant agrees to extend" the statutory deadlines upon receipt of a CRL as a condition for seeking drug approval. 21 C.F.R. § 314.100(c)(1). The CRL shifts the onus to the applicant to affirmatively request the NOOH to which it is statutorily entitled, and even then, the agency takes an additional 60 days to provide it. 21 C.F.R. § 314.110(b)(3).

In reality, FDA does not consider itself bound by even these extended deadlines. Rather, the agency processes applications in line with its self-selected goals under the Prescription Drug User Fee Act of 1992 (PDUFA). But Congress mandated that FDA act on new drug applications within 180 days; "[t]he FDA's regulations conflict with the tighter statutory requirements, and a regulation contrary to a statute is void." *Vanda Pharms., Inc. v. FDA*, 2024 WL 307387, at *4 (D.D.C. Jan. 26, 2024). Against the weight of Section 355(c)(1)'s text, FDA's arguments defending the unlawful structure it has erected fall apart.

FDA first contends that Vanda's Count III is outside the statute of limitations. That fundamentally mistakes that regulated parties may always challenge an agency rule as contrary to statutory authority *when it is applied* to the entity. Because the agency has straightforwardly applied its 60-day-filing and CRL regulations to Vanda, its claim challenging those rules as contrary to statute are timely.

On the merits, to defend its regulatory scheme over the FDCA's requirements, FDA pairs a tortured construction of Section 355(c)(1)'s text with an impossible reading of the Prescription Drug User Fee Act of 1992 (PDUFA). According to FDA, its regulations survive because the entire "pharmaceutical industry" has "agreed" to extend the agency's 180-day statutory review period to match FDA's self-selected PDUFA goals, and Congress intends for FDA to meet only those goals and not its statutory command. This Court has already rejected the notion that PDUFA impliedly repealed Section 355(c)(1)—and rightly so. *See Sandoz, Inc. v. Leavitt*, 427 F. Supp. 2d 29, 37 (D.D.C. 2006) ("[T]he mere fact that the FDA sets its aspirations somewhere below what the statute requires is not reason enough to ease the statutory provision. The FDA must comply with the statute, not visa-versa."). Because FDA's interpretation remains irreconcilable with Section 355(c)(1), this Court should reject FDA's arguments again.

Because no reasonable construction of PDUFA overrides Section 355(c)(1), FDA must defend its regulations as authorizing the delay Vanda experienced. As to its regulations, FDA principally contends that it retains discretion to preliminarily review drug applications for substantial completeness (under the 60-day-filing rule) and to offer flexibility to drug applicants on how to proceed when the agency intends to deny an application (under the CRL regulation). This case, however, is not about what FDA *may* do in reviewing a drug application, but *when* FDA must do it. Vanda challenges neither FDA's authority to preliminarily review applications for completeness nor to issue a CRL (or something like it). Rather, Vanda challenges FDA's ability to do these things in a way that unlawfully extends its statutory deadline to review Vanda's application,

without Vanda's consent.

Finally, FDA argues that the Court should not order any relief for Vanda in any event. But because the regulations that FDA applied to Vanda are unlawful, and the agency is positioned to imminently apply those regulations to Vanda again, declaratory relief is both within this Court's power and requisite to fashion Vanda relief. It is essential that the Court determine the appropriate legal rights vis-à-vis Vanda and FDA, as Vanda is currently suffering and expects to suffer yet more delay from FDA's disregard of Section 355(c)(1) and unlawful application of its regulations. *See* Moran Decl. ¶¶ 16; Vanda Pharms. Inc., 10-Q (Aug. 1, 2024), perma.cc/2EQB-UXTN (identifying forthcoming applications for milsaperidone in early 2025; iloperidone long-acting injectable by the end of 2024; a pending tradipitant application for treatment of symptoms in gastroparesis; and forthcoming application for tradipitant to treat motion sickness in fourth quarter 2024).

**ARGUMENT**

**A. Vanda's claims are within the statute of limitations.**

FDA cannot avoid a decision on the merits of its regulations by invoking the APA's six-year statute of limitations against Count III, which sets outs Vanda's position that the 60-day-filing and complete-response-letter regulations are invalid.

The parties *agree* that "when an agency 'seeks to apply the [challenged] rule,' in [that] case 'those affected may challenge *that application* on the ground that 'it conflicts with the statute from which its authority derives.'" FDA Opp. 18 (quoting *Weaver v. Fed. Motor Carrier Safety Admin.*, 744 F.3d 142, 145 (D.C. Cir. 2014)); *see also Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 144 S. Ct. 2440, 2448, 2454 & n.2 (2024) (recognizing as-applied claims). And FDA nowhere disputes that it has in fact applied the challenged regulations to Vanda's supplemental new drug application for tasimelteon to treat insomnia. *See* FDA Opp. 19-20. For good reason because the agency said it was applying these challenged regulations time and again. *See* AR2767 (your application "is considered filed 60 days after the date we received your application"); AR2964 "Within

one year after the date of this letter, you are required to resubmit or take other actions available under 21 C.F.R. § 314.110."); AR2969 ("upon receiving the complete response letter, Vanda must take one of the actions listed in 21 C.F.R. § 314.110(b)."); AR2975 (informing Vanda that FDA would "consider Vanda's" letter "to be a request for notice of opportunity for hearing" under 21 C.F.R. § 314.110).

The parties' common ground on these two essential points—that parties may challenge a rule as conflicting with the statute when it is applied to that party and that FDA applied the challenged rules to Vanda's sNDA submitted in May 2023—establish beyond debate that Vanda's claims are within the statute of limitations.

FDA attempts to avoid this obvious conclusion by raising two arguments—one procedural and one substantive. Neither has any merit.

**1.** FDA contends (at 18-19) that Vanda has not *pleaded* the application of the challenged rules and instead alleges only a "facial challenge." But FDA unfairly construes Vanda's complaint, and this is not a pleading obligation in any event. That FDA is left to rely on such procedural gymnastics is not only wrong, but it betrays the ultimate weakness of FDA's substantive position.

*First*, FDA's contention that Vanda's complaint alleges "only" a "facial" challenge to the regulations and does not include "allegations that FDA applied the rules to Vanda or how that application is unlawful" (FDA Opp. 18) is belied by the complaint itself. Vanda's complaint alleges clearly that it submitted a supplemental new drug application for tasimelteon to treat insomnia, that FDA applied the 60-day-filing regulation (Compl. ¶ 26), that FDA indicated that "deficiencies" precluded the agency from moving forward (*id.* ¶ 30), and that FDA "will send the applicant a complete response letter if the agency determines that we will not approve the application … in its present form" (*id.* ¶ 36). Vanda thus clearly alleged that the agency applied the challenged regulations to Vanda—and, of course, the administrative record proves beyond peradventure that the regulations were in fact applied to Vanda. *See* AR2767; AR2964; AR2969.

Vanda also alleges how that application is unlawful—and does so in great detail—because the regulations are irreconcilable with the statute and because, in Vanda's own case, FDA had long violated the statutory timeframe to act on its sNDA. *See* Compl. ¶¶ 34-35, 38-46, 73-78. Vanda's demonstration in the complaint that the regulations are unlawful is not at all inconsistent with Vanda's argument that *applying* these unlawful regulations to Vanda is unlawful.

*Second*, FDA also gets the legal framework wrong.

Most fundamentally, this is not a pleading obligation. *Contra* FDA Opp. 18. As the Supreme Court has explained, "[t]he distinction" between "facial and as-applied challenges" "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). FDA's focus on allegations in the complaint (FDA Opp. 18-19) is thus misplaced. Vanda has alleged an application of the rules and that the rules are unlawful under the statute—the salient question is then what *remedy* the Court can and should order. *See infra* at 38-39.

FDA also appears to labor under the misimpression that a challenge is "facial" where a party raises arguments that would apply generally. *See, e.g.*, FDA Opp. 18 (invoking *United States v. Salerno*, 481 U.S. 739, 745 (1987)). That is not correct. As the Supreme Court observed just last month, an "'as-applied' challenge[]" in this context is a challenge to agency action "adjudicating a party's own rights." *Corner Post*, 144 S. Ct. at 2454. That is precisely what we have here—FDA inaction *on Vanda's application*. Vanda is not challenging FDA's regulations in the abstract, as a party might do in a pre-application facial challenge; rather, Vanda is challenging very specific agency action that clearly *applies* those regulations *to Vanda*.

The judicial decisions confirming the timeliness of as-applied challenges when the rule is applied establish as much. "When an agency seeks to apply the rule, those affected may challenge that application on the grounds that it 'conflicts with the statute from which its authority derives.'" *Weaver*, 744 F.3d at 145 (quoting *Nat'l Air Transp. Ass'n v. McArtor*, 866 F.2d 483, 487 (D.C.

Cir. 1989)); *Genuine Parts Co. v. Envtl. Prot. Agency*, 890 F.3d 304, 316 (D.C. Cir. 2018) ("an agency's regulations may be attacked … once the statutory limitations period has expired … on the ground that the issuing agency acted in excess of its statutory authority *in promulgating them*," not just in applying them. (quoting *NLRB Union v. Fed. Labor Relations Auth.*, 834 F.2d 191, 195 (D.C. Cir. 1987)). It is the fact of the application of the rule that opens the courtroom doors. The *reason* that the application is unlawful can be generally applicable—that follows necessarily from a contention that the rule conflicts with the statute. Yet the cases could not be clearer that there is no limit on the substance of the arguments a plaintiff can make once the unlawful rule is applied. In the context of a suit challenging "that application," the party can "draw the validity of the rule [itself] in question" by arguing that it exceeds the agency's statutory authority. *Weaver*, 744 F.3d at 145. And, of course, "[o]nce a case is brought, no general categorical line bars a court from making broader pronouncements of invalidity in properly 'as-applied' cases.'" *Citizens United*, 558 U.S. at 331 (citation omitted). In addressing whether FDA's actions as to Vanda's application are unlawful, the Court is empowered to determine whether the regulations comply with FDA's statutory authority.[1]

That is this case precisely. Vanda has not brought a purely facial challenge to FDA's regulations, untethered to any specific drug application. Instead, as alleged and as proven, FDA has applied its 60-day filing and CRL regulations to Vanda's sNDA seeking approval for an insomnia indication for its drug Hetlioz®. After deciding that it would not approve the application as filed, FDA did not issue an NOOH until *400* days after Vanda filed its application. Vanda challenges FDA's unlawful withholding of the NOOH to which Vanda was statutorily entitled 180 days after it filed its application. And in so doing, Vanda contends that the regulations on which FDA relied

[1] Indeed, in the very cases FDA cites, courts have lamented the distinction between facial and as-applied challenges because "often the as applied/facial dichotomy represents nothing more than a distinction without a difference." *Plunkett v. Castro*, 67 F. Supp. 3d 1, 21 n.8 (D.D.C. 2014).

to perpetuate that delay are substantively unlawful because they contravene the FDCA. The relief Vanda seeks—a declaratory judgment that FDA's withholding was unlawful and an order preventing FDA from applying its unlawful regulations to Vanda—*depends* on a finding that the regulations exceed FDA's authority. This challenge fits squarely within *Weaver*—and it does so precisely as pleaded.

*Third*, even were there any merit to FDA's pleading-based arguments, it still cannot prevail based on this technicality. "A statute of limitations provides an affirmative defense, and thus a complaint need not anticipate and address a potentially applicable statute of limitations." *Jones v. Changsila*, 271 F. Supp. 3d 9, 24 (D.D.C. 2017) (citations omitted). Such motions can succeed "only where 'the factual allegations in the complaint [themselves] clearly demonstrate all elements of the statute of limitations defense *and* ... the plaintiff has no viable response to the defense.'" *Id.* (citation omitted). Add to it that "[p]leadings must be construed so as to do justice" (Fed. R. Civ. P. 8(e)), and that FDA has clearly been put on notice about what is at issue in this case. That much is proven by the agency compiling an administrative record that includes materials from Vanda's sNDA relevant to FDA's delays and materials relating to each challenged regulation. Given that Vanda's pleading *directly* asserts an as-applied challenge, FDA is certainly on notice that this is the substantive upshot of Vanda's argument.

What is more, the Court must "freely give leave [to amend] when justice so requires. Fed. R. Civ. P. 15(a)(2). Vanda included Count III in response to FDA's own argument in prior litigation criticizing Vanda for *not* including separate counts to alert the agency that Vanda's argument included that FDA's regulations were unlawful. FDA Mem. 14-15, *Vanda Pharms. Inc. v. FDA*, No. 22-cv-2775-CJN (Mar. 28, 2023), ECF No. 21-1. Having previously criticized Vanda for not including sufficient specificity for the agency to understand that the validity of its regulations was at issue, FDA cannot seriously assert that the inclusion of a count expressly stating Vanda's contention that FDA's regulations are invalid and unlawful precludes any understanding from Vanda's

complaint that Vanda is raising an as-applied challenge. But if that were the Court's preference, Vanda can easily amend its complaint to sprinkle in "as applied to Vanda." *See, e.g.*, Proposed Order (limiting the declaratory relief it seeks "as applied to Vanda").

**2.** On substance, FDA contends that Vanda does not allege that "FDA has 'applied' the rules in a way" that qualifies under *Weaver* and that Vanda has not "define[d] … the actual 'application' of the rules that it now challenges." FDA Opp. 19-20. That is plainly incorrect.

*Weaver* rejected the argument FDA suggests here (FDA Opp. 19-20)—that its rule is somehow limited only to particular agency actions. 744 F.3d at 145 ("[T]he sort of 'application' that opens a rule to such a challenge is not limited to formal 'enforcement actions.'"); *Am. Scholastic TV Programming Found. v. FCC*, 46 F.3d 1173, 1178 n.2 (D.C. Cir. 1995) (parties may challenge regulations as in excess of statutory authority in "nonenforcement proceedings where the party is nevertheless harmed by application of the regulation").

FDA has engaged in challengeable agency action—its unlawful "inaction" (5 U.S.C. § 551(13) (defining "agency action")), which is expressly reviewable under the APA (*see* 5 U.S.C. § 706(1))—and FDA does not contend otherwise. FDA's application of its unlawful regulations directly facilitated FDA's unlawful failure to act. *See* Vanda Br. 13-15, 24-26. *Weaver* thus applies squarely to permit Vanda to challenge the regulations, and Vanda's claims were timely. With a cause of action and a timely one at that, this Court's task is to "decide all relevant questions of law [and] interpret constitutional and statutory provisions" (5 U.S.C. § 706), and it is empowered to—and should—order relief declaring Vanda's rights (28 U.S.C. § 2201; *Citizens United*, 558 U.S. at 331 ("[o]nce a case is brought, no general categorical line bars a court from making broader pronouncements of invalidity in properly 'as-applied' cases.'")). *See infra* at 38-42.

### B. FDA's delays and the regulations that facilitate them are unlawful and may not be applied to Vanda.

The FDCA's procedures for filing and acting on a drug application are straightforward. The Act provides that any person may file an application and then directs FDA to either approve

or issue an NOOH within 180 days. 21 U.S.C. §§ 355(b)(1), 355(c)(1).

FDA has nonetheless arrogated to itself the power to not comply with this clear statutory mandate. It has done so, as Vanda explained in its opening brief, by applying two regulations: First, FDA does not treat a filed application as "filed" under Section 355 until 60 days have elapsed, and the agency "determine[s] [that] the NDA may be filed." 21 C.F.R. § 314.101(a). And, second, rather than issue an NOOH within 180 days if the agency does not intend to approve the application, FDA instead issues a complete response letter, shifts the burden to the applicant to request the NOOH to which it is entitled, decrees that the applicant has "agree[d] to FDA's delay, and then takes 60 more days to issue the NOOH. The FDCA authorizes none of this—180 days means 180 days.

***1. The FDCA requires an approval or NOOH within 180 days.***

As Vanda's opening brief showed (at 5-6, 16), the FDCA sets a specific deadline for FDA's review of NDAs and sNDAs: "[w]ithin one hundred and eighty days after the filing of an [NDA], … the [FDA] shall either—(A) approve the application ... or (B) give the applicant notice of an opportunity for a hearing." 21 U.S.C. § 355(c)(1). The statute recognizes one exception to the 180-day timeframe: where an "additional period" is "agreed upon by the Secretary and the applicant." *Id.* The statute thus sets a mandatory timeframe within which FDA must either approve the application or—if it has substantive reservations—permit the applicant to make its best case for approvability to the ultimate agency decision-maker in a hearing.

This Court's task is to determine whether the "best reading" of Section 355(c)(1) permits the agency to issue an approval or notice of opportunity of hearing more than 180 days after FDA receives the application. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024). The answer follows easily: Section 355(c)(1) plainly does not permit FDA to issue the approval or notice of opportunity for a hearing after *more* than 180 days. *See In re Barr Lab'ys, Inc.*, 930 F.2d 72, 74 (D.C. Cir. 1991); *Sandoz*, 427 F. Supp. 2d at 34-38; *Vanda Pharms.*, 2024 WL 307287, at

*1. It is this statutory mandate that then defines the strictures within which the agency must operate. *Loper Bright*, 144 S. Ct. at 2273 ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires.").

### *2. Section 355(c)(1) was not impliedly repealed or amended by PDUFA.*

Section 355(c)(1) means what it says, and its text could not be clearer. *See supra* at 9-10. To avoid the statute's text, FDA contends that Congress's enactment of PDUFA in 1992 effectively repealed its obligation to comply with Section 355(c)(1). A court in this District has already rejected this contention. *See Sandoz*, 427 F. Supp. 2d at 34-37. It is as meritless today as it was when *Sandoz* was decided—nothing in PDUFA in any way alters the clear statutory deadline contained in Section 355(c)(1).

"[R]epeals by implication are not favored." *Maine Community Health Options v. United States*, 590 U.S. 296, 315 (2020) (quoting *Morton v. Mancari*, 417 U.S. 535, 549 (1974)). "Presented with two statutes, the Court will 'regard each as effective'—unless Congress's intention to repeal is 'clear and manifest' or the two laws are 'irreconcilable.'" *Id.* (quoting *Morton*, 417 U.S. at 550-551). As we show below, PDUFA is a funding mechanism, the availability of which is conditioned on FDA setting its own "goals" in consultation with interested parties. Section 355(c)(1), on the other hand, sets forth FDA's obligation to act on drug applications within 180 days. As the Supreme Court observed in *Maine Community*, to avoid complying with a statutory obligation, "the Government must point to 'something more than the mere omission to appropriate a sufficient sum.'" 590 U.S. at 315. That reasoning has purchase here—Congress endeavored to provide additional funds for FDA's activities through PDUFA, while leaving the 180-day obligation of Section 355(c)(1) fully intact.

#### *a. PDUFA enacted a funding mechanism to help reduce FDA's violations of statutory deadlines, not to override them.*

PDUFA was a congressional response to FDA's systematic failure to comply with Section 355(c)(1). In the early 1990s, FDA's delays in acting on drug applications were abysmal. The

agency took "an average of 20 months"—more than 600 days—"from the time an application to market a new drug is submitted, to reach a decision on the application." H.R. Rep. No. 102-895, at *9 (Sept. 22, 1992). "Even in the FDA's view, the delays [were] severe." *In re Barr Lab'ys*, 930 F.2d at 74.

Applicants facing these enormous delays thus turned to the courts for aid. In *In re Barr Laboratories*, FDA "[e]ffectively conced[ed] that it has violated the 180–day provision," but the Court declined to enter injunctive relief after analyzing the *TRAC* factors. 930 F.2d at 74. The D.C. Circuit then prodded "Congress [to] earmark more funds" to support FDA's drug-review process. *Id.*

Rather than modify FDA's obligation to act within 180 days, Congress gave FDA more resources. That is, although "Congress recognized the FDA's inability to meet the statutory deadline[,] … in response, [it] took no direction to modify the 180-day action window but instead created a program, the PDUFA, to boost FDA's resources." *Sandoz*, 427 F. Supp. 2d at 37 (citing 21 U.S.C. § 379g).

Under PDUFA, Congress empowered FDA to "assess and collect fees" for processing drug applications. Prescription Drug User Fee Act of 1992, Pub. L. No. 102-571, 106 Stat. 4491 (Oct. 29, 1992); 21 U.S.C. § 379h(a). Congress made express findings that "prompt approval of safe and effective new drugs is critical," that "the public health will be served by making additional funds available," and that "the fees authorized by this title will be dedicated toward expediting the review of human drug applications as set forth in the goals identified" in two letters from the FDA Commissioner. Pub. L. No. 102-571 § 102; 138 Cong. Rec. 26,928 (Sept. 22, 1992) (FDA 1992 commitment to act on "priority" applications "within six months" and "standard" applications "within 12 months"). The statute thus recognized the "goals" in its findings and authorized FDA to collect fees to aid in achieving those goals.

PDUFA is thus a funding mechanism. It was a legislative effort to improve FDA's

persistent delays by requiring the drug industry to fund FDA review operations. PDUFA nowhere amended or repealed Section 355(c)(1)'s 180-day deadline. *See generally* Pub. L. No. 102-571. All PDUFA says is that FDA is allowed to collect user fees subject to certain parameters on how those fees are calculated. *See* 21 U.S.C. § 379h(b).

Over the years, Congress has reauthorized the funding mechanism. FDA has continued to send letters with its "goals" to Congress, and Congress has reauthorized the agency to collect user fees expressly dedicated to expediting review. *See, e.g.*, PDUFA VII, Pub. L. No. 117-180, tit. I, § 1001(b), 135 Stat. 2140 ("Congress finds that the fees authorized by the amendments made by this title will be dedicated toward expediting the drug development process and the process for the review of human drug applications … as set forth in the goals identified … in the letters from the Secretary of Health and Human Services … ."). At no time has Congress repealed or amended Section 355(c)(1). Instead, through PDUFA, Congress created a funding mechanism earmarked for drug review as one method to address FDA's severe delays. The conditions attached to that funding mechanism—that FDA identify certain "goals" in "consult[ation]" with Congress, scientific and academic experts, health care professionals, patient and consumer advocacy groups, and the regulated industry (21 U.S.C. § 379h-2(f))—in no way negate the obligation of Section 355(c)(1).

#### *b. PDUFA did not impliedly repeal Section 355(c)(1) nor effect industry "agreement" that Section 355(c)(1) is a dead letter.*

FDA does not seriously defend its view that PDUFA goals override Section 355(c)(1)'s 180-day mandate with the text of *either* Section 355(c)(1) or PDUFA itself. Instead, it points amorphously to "Congress's intent" and its own interpretation of the statutes. But FDA's argument is really that PDUFA impliedly repealed Section 355(c)(1). FDA comes nowhere close to making such a showing.

**i.** "[R]epeals by implication are not favored." *Maine Community*, 590 U.S. at 315 (quoting *Morton*, 417 U.S. at 549). "Presented with two statutes, the Court will 'regard each as

effective'—unless Congress's intention to repeal is 'clear and manifest' or the two laws are 'irreconcilable.'" *Id.* (quoting *Morton*, 417 U.S. at 550-551).

A court in this District has already rejected FDA's contention that PDUFA supplanted FDA's obligation to comply with Section 355(c)(1). In *Sandoz*, a drug applicant challenged FDA's substantial delay in acting on its application for the drug Omnitrope. 427 F. Supp. 2d at 31. In that case, FDA did "not dispute the fact that [it] ha[d] not acted in accordance with" Section 355(c). *Id.* at 34. Instead, it "argued that the 180-day 'time frame' is 'aspirational rather than mandatory, … based on its reading of the Prescription Drug User Fee Act of 1992." *Id.* (quoting Def's Motion). The Court disagreed, concluding that the FDCA "requires FDA to take action on an NDA within 180 days of its submission," and that this is "a mandatory obligation." *Id.* at 34.

The Court understood that, "[w]ithout saying so," FDA was actually "arguing that the PDUFA, through its circuitous reference to the Performance Goals, repeals by implication 21 U.S.C. § 355(c)." *Sandoz*, 427 F. Supp. 2d at 35. The Court disagreed, explaining "[t]he cardinal rule … that repeals by implication are not favored." *Id.* (quoting *Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497, 503 (1936)). And because "courts are not at liberty to pick and choose among congressional enactments, … when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Id.* (quoting *Morton*, 417 U.S. at 551). The Court found no such irreconcilable conflict. FDA's PDUFA commitment letter "concerns the FDA's goals, not the FDA's statutory obligations. And the mere fact that FDA sets its aspirations somewhere below what the statute requires is not reason enough to erase the statutory provision." *Id.* at 37. It went on to emphasize: "FDA must comply with the statute, not visa-versa." *Id.*

Buttressing its straightforward reading of the statute, the Court further noted that PDUFA's historical context is unhelpful to FDA. "Congress recognized the FDA's inability to meet the statutory deadline," yet "took no direct action to modify the 180-day action window but instead

created a program, the PDUFA, to boost the FDA's resources." 427 F. Supp. 2d at 37. Ultimately, without "express congressional action" indicating that "Congress meant to transmogrify section 355(c) from a mandatory statutory requirement to a non-mandatory goal," like amending the word "shall" to "may," the court was "unwilling to alter the 180-day action requirement simply because FDA cannot cope." *Id.* at 36-38.

The considered decision in *Sandoz* is on all fours here. PDUFA is, to put it simply, a funding bill. FDA's congressional authorization to obtain funds from drug applicants—without which its drug-review process would be even slower—does not compel the conclusion that Congress repealed its own requirements in the FDCA. In fact, even when FDA *meets* its PDUFA goals, Congress still requires the agency to submit a "corrective action report [that] shall include recommendations on ways in which the Secretary can improve and streamline the human drug application review process." 21 U.S.C. § 379h-2(c)(1). Section 355(c)(1) and PDUFA each can and do have effect. There is nothing inconsistent with directing FDA to set "goals" by which it will review applications and permitting FDA to charge fees to help meet those goals, while still requiring FDA to resolve a new drug application within 180 days. PDUFA was a practical response to FDA's recalcitrance to Congress's enactments. But FDA *can* comply with both PDUFA and with Section 355(c)(1). It can decide new drug applications within 180 days; that satisfies Section 355(c)(1) and would contribute to FDA meeting its PDUFA goals. Or FDA could seek legitimate "agree[ment]" from a sponsor that it would forgo the statutory deadline and accept a decision on the PDUFA goal date. What FDA *cannot* do is contend that Section 355(c)(1) has been repealed.

If Congress wanted to lift its statutory requirement that FDA act on drug applications in 180 days, it would have been easy to do so. Instead, Congress created a funding mechanism to allow FDA the resources to perform its duties.

**ii.** FDA nonetheless insists that Congress "intends" that FDA follow only its PDUFA

goals—that it "must" be correct that PDUFA goals are "agreements" "[t]o give effect to the PDUFA review framework." FDA Opp. 23-27. This argument runs headlong into the previous ruling from this District in *Sandoz*, which squarely rejected the view that PDUFA rendered Section 355(c)(1)'s 180-day timeframe anything less than mandatory.

For the same reason the *Sandoz* court recognized that Section 355(c)(1) and PDUFA were sufficiently compatible to "regard each as effective" (427 F. Supp. 2d at 35 (quoting *Morton*, 417 U.S. at 551)), this Court need not read PDUFA to somehow modify its "construction of the earlier statute," Section 355(c)(1). *See* FDA Opp. 25-26 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000)). Rather, FDA's insistence that Vanda's plain reading of Section 355(c)(1) renders PDUFA and the related priority review statutes "nonsensical" or "superfluous" (FDA Opp. 26) depends entirely on FDA setting "goals" that fall well outside the statute's requirements. Indeed, Section 355(c)(1) and PDUFA *should* work in perfect tandem, with Section 355(c)(1) defining FDA's obligations and PDUFA providing the means to accomplish them. But "the mere fact that FDA sets its aspirations somewhere below what the statute requires is not reason enough to erase the statutory provision." *Sandoz*, 427 F. Supp. 2d at 37.

FDA nakedly asks this Court to reject *Sandoz*, creating an in-District split of authority. FDA Opp. 25. But the reasons FDA gives for doing so are unpersuasive.

First, FDA notes that *Sandoz* predates four PDUFA reauthorizations and the priority-review-voucher statute. But FDA does not point to any relevant change to PDUFA in the intervening years. The structure has remained essentially unchanged. As to the priority-review statute, FDA offers no explanation as to how that statute repealed Section 355(c)(1). Instead, once again, Congress enacted a practical solution to FDA's delays—by encouraging sponsors to develop certain "tropical disease product application[s]" and providing them a voucher guaranteeing review of a *different* drug application in "not later than 6 months" as described in FDA policies and PDUFA goals. 21 U.S.C. § 379(a)(1). But this statute did not impliedly repeal Section 355(c)(1) for the

same reasons that PDUFA did not, and FDA points to no evidence that it did. Instead, Section 355(c)(1) and priority review are entirely reconcilable—but for the practical reality that FDA chooses to set its aspirations so low. FDA could set PDUFA goals to achieve Section 355(c)(1) deadlines on standard applications, and the "priority review" program would go yet faster. That FDA chooses not to do so is not evidence that *Congress* intended to repeal Section 355(c)(1).

Second, FDA argues that the *Sandoz* court did not consider FDA's interpretation of the statute. FDA Opp. 25. But *Sandoz* found the statute "unambiguous," as FDA admits. *Id.* This is a *strength* of *Sandoz* in the wake of *Loper Bright*. Even under a *Chevron* regime, a federal court held that FDA's interpretation was wrong. No doubt in a post-*Chevron* world, FDA's interpretation remains just as wrong.

Finally, FDA argues that *Sandoz* is unhelpful because it "addressed the matter solely as whether PDUFA implicitly repealed Section 355(c)(1), which is not the position the government now advances." FDA Opp. 25. But FDA's argument that PDUFA "goals" are "agreements" under Section 355(c)(1) is so patently irreconcilable with the text (as we next explain) that it does nothing more than dress the same argument rejected in *Sandoz* in different clothing. Fundamentally, the agency's position has not changed: it asks this Court to cast aside the plain meaning of Section 355(c)(1) and instead allow the agency's self-selected PDUFA goals to control. For the same reasons as in *Sandoz*, this is an argument that PDUFA impliedly repealed Section 355(c)(1). The *Sandoz* court rejected the argument, and this Court should as well.

**iii.** Even taking it at face value, FDA's recast position (at 22-23)—that PDUFA goals constitute an "additional period … agreed upon by the Secretary and the applicant" to extend the agency's 180-day deadline—is irreconcilable with Section 355(c)(1).

Section 355(c)(1)'s text is clear that any "agreement" to extend FDA's review period must be formed between the agency "and *the applicant*." 21 U.S.C. § 355(c)(1) (emphasis added). "It 'is a rule of law well established that the definite article 'the' particularizes the subject which it

precedes.'" *Sandpiper Residents Ass'n v. U.S. Dep't of Hous. & Urban Dev.*, 106 F. 4th 1134, 1144 (D.C. Cir. 2024) (quoting *Am. Bus Ass'n v. Slater*, 231 F.3d 1, 4-5 (D.C. Cir. 2000)); *see also United States v. Bailey*, 2023 WL 2139365, at *5 (D.D.C. Feb. 21, 2023) ("Where used as an adjective, and in contrast to an indefinite article (e.g., 'a'), which 'points to nonspecific objects, things, or persons that are not distinguishable from the other members of a class,' a definite article (e.g., 'the') speaks to something specific and distinct." (quoting The Chicago Manual of Style §§ 5.70-71, 5.75, pp. 166-167 (15th ed. 2003)). When Section 355(c)(1) refers to "*the* applicant," it can only mean the specific "person" filing "the application" under Section 355(b).

Here, Vanda is "the applicant" referenced in the statute. It is Vanda's application that is subject to being approved or rejected. And Vanda has never agreed to extend the agency's deadline. Quite to the contrary, Vanda has repeatedly insisted that FDA *follow* the statutory requirement. *See, e.g.*, AR2973. This exception for agreement is thus clearly inapplicable.

FDA nonetheless asserts that "PDUFA goals are … an agreement" under Section 355(c)(1)" between "FDA and *the pharmaceutical industry*." FDA Opp. 21-22 (emphasis added). That argument borders on the absurd: "The pharmaceutical industry" writ large cannot "agree" to extend FDA's review deadline for Vanda's application. Nothing in Section 355 remotely suggests that some amorphous, asserted understanding between FDA and "the pharmaceutical industry" can displace Vanda's specific, statutory right to have its application adjudicated within 180 days. Rather, Section 355(c)(1) plainly addresses the relationship between FDA and the specific applicant itself—not the industry in general. FDA's claims otherwise lack any conceivable merit.

Not only is this claimed statutory argument exceedingly misguided, there is no evidence that "the pharmaceutical industry" "agree[s]" to FDA's PDUFA goals in any event. To make the argument work, FDA (at 24) must substantially downplay its exclusive statutory authority to determine fee amounts and set its "goals." There is no dispute that Congress guides FDA's calculation of fee amounts. *See* 21 U.S.C. § 379h(b)-(c). But ultimately, FDA retains discretion to

"adjust" the "annual base revenue" amount upward "to reflect changes in the resource capacity needs of the Secretary for the process for the review of human drug applications." *Id.* § 379h(c)(3)(A). And while Congress requires that FDA adhere to a "capacity planning methodology" (*id.* § 379h(c)(3)(B)) and sets a *floor* on the fee amount (*id.* § 379h(c)(3)(C)), Congress sets no maximum fee. Thus, as Vanda explained, if the now "$4,000,000 [fee] per application is insufficient to satisfy [FDA's] 'resource capacity needs,' FDA is free to," indeed, it must, "raise the fee" so it can meet its statutory obligations. *See* Vanda Br. 9. FDA does not identify any barrier to doing so.

Nor does "the negotiated nature" of the "goal and the fees" (FDA Opp. 24) change matters. To be sure, drug manufacturers participate in the process, and FDA is obligated to consider their views. *See* 21 U.S.C. § 379h-2(f)(1)-(3). Of course, FDA must *also* consider the views of many other interested parties—including health care professionals, patient and consumer advocacy groups, scientific and academic experts, and the public. Yet the statute does not require that drug manufacturers *agree* to FDA's goals any more than it requires agreement by "health care professionals" or "representatives of patient and consumer advocacy groups." *Id.* § 379h-2(f)(3), (5)-(6). FDA thus badly overstates the "negotiated nature of both the goals and the fees." FDA Opp. 24. These goals and fees reflect little more than a typical rulemaking process in which an agency considers numerous competing views, including from regulated industry, and then selects its course of action. And we must repeat: FDA cannot unilaterally decree a drug manufacturer's "agreement" to extend its review period. Vanda Br. 20-23; *supra* at 14; *infra* at 33-36.

Finally, even assuming that the entire "pharmaceutical industry" "agree[s]" to FDA's "goals," these are *goals* through which FDA commits to resolving, for example, 90% of sNDAs within ten months. *See, e.g.*, FDA, PDUFA VII Commitment Letter at 4 & § I.A.1.2.a (2022). No one would reasonably understand a "goal" of resolving 90% of all industry applications within 10 months as constituting any particular applicant agreeing that FDA need not decide *its* application

for 10 months. FDA could, of course, satisfy its goal by resolving an application within the 180 days the statute contemplates. In short, nothing about PDUFA suggests that Congress intended to discard Section 355(c)(1) by enacting PDUFA as an "agreement" mechanism under Section 355(c)(1).

**iv.** With no support in Congress's enactments, FDA turns to its own interpretation of its own CRL regulation—written in a preamble to the CRL regulations in 2008—and attempts to spin that into an interpretation of the intersection of Section 355(c)(1) and PDUFA. *See* FDA Opp. 27-29. By that point, this Court had issued *Sandoz*; the purpose of FDA's preamble—to override a court's construction of the plain meaning of the statutes—is thus evident. *See* FDA Opp. 25. But FDA cannot override clear statutory text through agency interpretation in any event. *See Loper Bright*, 144 S. Ct. at 2266. FDA's contention that it interpreted its PDUFA goals to be "accepted by mutual agreement between industry and FDA" thus carries no weight because it is fully inconsistent with the statutory text for the reasons we have already explained. *See supra* at 16-19.

Nor is FDA's interpretation entitled to any deference. For one, Section 355(c)(1)'s provision that FDA and "*the* applicant" may "agree" to a deadline extension is so clearly tethered to the manufacturer that FDA's newfound argument that the "pharmaceutical industry" may reach such an agreement is far outside the scope of contention that could warrant *Chevron* deference. But that is immaterial now. Under *Loper Bright*, the defects in FDA's reasoning—in which it cannot identify any textual support—are plainly fatal. Although the plain meaning of the statute resolves matters, FDA's position that PDUFA somehow effects an "agreement" was first announced in 2008—16 years after PDUFA was first enacted and very shortly after *Sandoz*, where the court rejected FDA's original view that PDUFA excused Section 355(c)(1)'s mandate. Plagued by such "[in]consistency with earlier … pronouncements" and close juxtaposition with an unfavorable court ruling, FDA's reading lacks any persuasive value whatsoever. *Id.*

Nor did Congress "ratify" this regulation. As we explain below (*infra* at 26-28), FDA's

argument that Congress "impliedly ratified" FDA's CRL regulations is wrong. But FDA's particular argument here—that Congress not only ratified FDA *regulations*, but FDA's specific explanation for its regulation articulated in the rule's preamble—is even more far-fetched. An implicit ratification can be appropriate only "when there is evidence that Congress considered and rejected the '*precise* issue' presented before the Court." *Rapanos v. United States*, 547 U.S. 715, 750 (2006) (quoting *Bob Jones Univ. v. United States*, 461 U.S. 574, 600 (1983) (emphasis added)). Congress has not, in any relevant respect, revisited Section 355(c)(1) since FDA issued its 2008 regulation, and Congress's reauthorization of PDUFA without any relevant changes that would suggest it agreed with FDA's preamble is far too thin a reed on which to eviscerate Section 355(c)(1)'s clear meaning.

* * *

Congress's decision to allow FDA to obtain additional funding from drug applicants to ameliorate the agency's even more egregious delays in resolving drug applications neither amends nor excuses the FDCA's requirements. The *Sandoz* court already held as much. The Court should reject FDA's invitation that it expressly depart from *Sandoz*.

#### 3. FDA's regulations contravene Section 355(c)(1)'s 180-day deadline and are thus unlawful.

FDA's misunderstanding of PDUFA infects the remainder of its argument. FDA may believe that PDUFA blessed its systematic failure to comply with Section 355(c)(1). *See, e.g.*, FDA Opp. 27-28 (citing FDA's preamble to its own unlawful rule characterizing PDUFA this way). But the obligation to construe statutes rests with courts (*Loper-Bright*, 144 S. Ct. at 2266), and nothing about PDUFA changed Section 355(c)(1)'s mandatory 180-day deadline. FDA's regulations that subvert the 180-day deadline are unlawful and cannot be applied to Vanda.

##### a. FDA's 60-day filing regulation is contrary to the FDCA.

As Vanda explained in its opening brief (at 16-17), FDA's 60-day filing regulation defies the FDCA's text by providing that an applicant's "filing" of a drug application does not occur—

and thus does not trigger Section 355(c)(1)'s clock—until 60 days later. 21 C.F.R. § 314.101(a)(1)). FDA's regulation—adding fully 33% to Section 355(c)(1)'s mandatory review timeframe—is outside "its statutory authority." *Loper Bright*, 144 S. Ct. at 2273. FDA offers no reading of the FDCA's text—none—in response to Vanda's straightforward reading. It can hardly be the "best reading" if there is not one at all. *Id.* at 2266. Instead, FDA relies on decades-old non-binding caselaw concerning a prior iteration of FDA regulations and a congressional-ratification argument. FDA Opp. 29. But *Loper Bright* undercuts any value of the first, and FDA has come nowhere close to presenting the "overwhelming evidence" of congressional acquiescence to justify "replac[ing] the plain text and original understanding of a statute with an amended agency interpretation." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169 n.5 (2001).

**i.** As Vanda explained (at 17), the plain meaning of the term "file" compels the conclusion that the 180-day clock starts when the applicant submits its application. To "file" is "to deliver (as a legal paper or instrument) after complying with any condition precedent (as the payment of a fee) to the proper officer for keeping on file or among the records of his office." *File*, Webster's Third New International Dictionary 849 (1986). An NDA is thus "filed" under the FDCA when an applicant "deliver[s]" it to FDA, and that delivery starts the 180-day clock for FDA to either grant the application or issue an NOOH. *See* 21 U.S.C. § 355(c)(1)(B).

The neighboring statutory provision—Section 355(b)(1)—requires this conclusion. It expressly provides that it is the *applicant* who does the "filing" of a new drug application—not the agency. *See* 21 U.S.C. § 355(b)(1) ("*Any person* may file with the Secretary an application with respect to any drug." (emphasis added)). The two provisions placed together provide the following:

**(b)(1)(A):**

> *Any person may file* with the Secretary an application with respect to any drug subject to the provisions of subsection (a).

**(c)(1):**

> Within one hundred and eighty days after *the filing of an application under subsection (b)*, or such additional period as may be agreed upon by the Secretary and the applicant, the Secretary shall either—(A) approve the application … or (B) give the applicant notice of an opportunity for a hearing ….

21 U.S.C. § 355(b)(1)(A), (c)(1) (emphasis added).

The provisions in context create a scheme in which the applicant files the application and then the Secretary "within one hundred eighty days" after "the filing of the application under subsection (b)"—which again is done by the applicant—must approve or issue an NOOH.

The 60-day filing rule, which sets the "date of filing … 60 days after the date FDA received the NDA" and provides that *FDA*—not the applicant—"files" the application conflicts with the "best reading" of the FDCA's text. *See* 21 C.F.R. § 314.101(a)(2) ("If FDA finds that none of the reasons in paragraphs (d) and (e) of this section for refusing to file the NDA apply, *the Agency will file* the NDA and notify the applicant in writing." (emphasis added)); *id.* § 314.101(a)(3) ("If *FDA refuses to file* the NDA, the Agency will notify the applicant in writing and state the reason under paragraph (d) or (e) of this section for the refusal." (emphasis added)).

For its part, FDA does not disagree with Vanda's definition of "file" or counter with one of its own. Instead, it contends that despite the plain meaning of "file," the FDCA "does not identify the point at which 'the filing of an application'" occurs and thus leaves "room for FDA to determine when the application 'may be filed.'" FDA Opp. 29. In other words, according to FDA, the term "filing" is ambiguous so the agency gets to decide "when" it happens. Whatever purchase that argument may have had previously, *Loper Bright* has now gutted it. 144 S. Ct. at 2261. This Court must "decide '*all* relevant questions of law' arising on review of agency action—even those involving ambiguous laws—and set aside any such action inconsistent with the law as they interpret it." *Id.*

The text ends the feud here. As Vanda pointed out and as FDA acknowledges, the statute provides that "the applicant rather than the agency 'files' the application" (FDA Opp. 31), and

Section 355(c)(1) then tethers its own timing—180 days—to "the filing" of the application "under subsection (b)." FDA maintains that the statute "says nothing about when a filing is *deemed* to occur." FDA Opp. 31 (emphasis added). But the reason for the FDCA's silence on when a filing is "deemed" to occur is obvious: A "filing" occurs when the applicant submits the NDA, consistent with the term's plain meaning; a "deemed filing date" is a concept of the agency's own invention, created for the purpose of the delay. It is astatutory and thus unlawful. The FDCA's text needs no date on which an application is "deemed" filed because an application is filed on the date when the applicant in fact files it.

Nor is it any answer that an applicant has not satisfied "conditions precedent" to filing until FDA determines the application is complete. *See* FDA Opp. 31 ("an application is filed after every condition precedent is satisfied—that is, after FDA determines that the application is 'sufficiently complete to permit a substantive review' and that 'none of the reasons … for refusing to file the [application] apply.'" (quoting 21 C.F.R. § 314.101(a)(1)-(2)). Of course, completeness is not implicated here—after all, FDA found Vanda's application sufficiently complete. AR2767. But there is no statutory basis in any event that suggests FDA must determine whether an application is complete or not before it is "*filed*." *See* 21 U.S.C. § 355(d) (outlining the only grounds for refusing to approve an application, only one of which concerns general incompleteness, i.e., "where the application failed to contain the patent information prescribed by subsection (b)"). A sufficiently complete application is complete at the *time of filing*—even if FDA has not yet confirmed as much. Thus, none of this is to say that FDA cannot, consistent with the FDCA, begin its review process with a checklist to ensure the application is "sufficiently complete to permit a substantive review" to avoid dedicating resources to a facially noncompliant application. But the agency must do so *within* the 180-day review period the FDCA requires—not by adding onto the 180-day deadline. And if an application is not complete, nothing precludes FDA from telling an applicant promptly, allowing the applicant to withdraw and resubmit the application, restarting the

clock.

In fact, that is precisely how FDA operated in the decades before Congress amended the FDCA in 1962 to enact the 180-day deadline that remains in place today. Historically, FDA regulations authorized the agency to *reject* incomplete filings, but otherwise treated complete applications as "filed" on "the date on which [the] application [was] *received*."[2] 21 Fed. Reg. 5,576, 5,579 (July 25, 1956) (prior 21 C.F.R. § 130.5) (emphasis added); 6 Fed. Reg. 1,920, 1,921 (Apr. 15, 1941) (prior 21 C.F.R. § 2.110) (same); 3 Fed. Reg. 3,161, 3,168 (Dec. 28, 1938) (implementing FDCA Section 505(d)); *see also* 39 Fed. Reg. 11,680, 11,726 (Mar. 29, 1974) (prior 21 C.F.R. § 314.110) (same). When Congress amended Section 355(c)(1) to require FDA to act on an application within 180 days of a *filing*, it "acted against the backdrop of the FDA's consistent" position that a complete application is "filed" when the agency receives it. *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). This history reinforces the term's plain meaning, further reflecting Congress's intent that the 180-day clock would begin when the agency receives the application, not 60 days after the fact.[3]

Under the 60-day-filing regulation, FDA assigns a different filing date—60 days *after* the applicant filed the application—allowing FDA to systematically tack on an extra 60 days to the 180-day review period. The regulation cannot be squared with Section 355(c)(1)'s text.

---

[2] When mail submission of applications was common, "filing" occurred when the application was received by FDA. Now, with electronic submissions, the receipt is simultaneous. AR2746. In all events, filing never occurred whenever FDA chose to "deem" an application filed—weeks or months after its *actual* filing by the applicant.

[3] FDA may observe that, before it promulgated the 60-day filing rule, "applications may [have been] under review for many months, if not years" while the agency decided whether an application is sufficiently complete for substantive review. *See* New Drug and Antibiotic Regulations, 47 Fed. Reg. 46,622, 46,638 (Oct. 19, 1982). But even so, under the previous regulations, the filing date for a complete application was still the date of receipt. Whenever FDA lingered for "many months, if not years" in deciding whether an application was sufficiently complete, only to find that it was, the agency thus committed an egregious statutory violation. That FDA tried to cure an unlawful scheme by replacing it with a different one does not make the latter any more consistent with the statute or any less unlawful. The relevant issue here is that, when Congress last amended Section 355(c)(1), all understood that an application was filed when received by FDA.

**ii.** To overcome the text, FDA marshals two non-binding judicial decisions that are more than 40 years old to support its view. FDA Opp. 31. But those cases cannot bear the weight the agency assigns them. Each case dealt with a dispute over FDA's regulations authorizing a "completeness" review. In *Newport Pharmaceuticals International Inc. v. Schweiker*, the court acknowledged that "there ha[d] been some controversy over the meaning of the word 'filing'" but found "the agency's consistent interpretation must prevail" in light of the "considerable deference" it owed to "agency interpretation of … the statute under which it operates." 1981 WL 768924 (D.D.C. Dec. 2, 1981) (citing *United States v. Rutherford*, 442 U.S. 544, 553-554 (1979) and *Udall v. Tallman*, 380 U.S. 1, 16 (1965)). The Seventh Circuit's decision in *Durovic v. Richardson* summarily decreed without any analysis that "the regulation [providing that "an application shall not be accepted for filing if incomplete on its face by omission of required material]" was "a reasonable means of determining the fact and time of filing an application." 479 F.2d 242, 245 (7th Cir. 1973).

Although these decisions predated *Chevron*, they drew from the same "long judicial tradition of according 'considerable weight' to Executive Branch interpretations" that produced the *Chevron* doctrine in the first place. *See Loper Bright*, 144 S. Ct. at 2264. Neither court considered—as this Court must—whether FDA had the "best" reading of Section 355(c)(1)'s text. *See id.* at 2266. This deference did not survive *Loper Bright*, which rejected the "misguided" presumption that "agencies have [any] special competence in resolving statutory ambiguities." *Id.* at 2266.

Nonetheless, FDA insists based on these cases that its interpretation of the FDCA's "filing" provision is still entitled to "weight" because of "the thoroughness evident in its consideration" and its "consistency with earlier and later" interpretations of the same statute. *See* FDA Opp. 31 (quoting *Loper Bright*, 144 S. Ct. at 2259 (discussing *Skidmore*). That is wrong: The meaning of "filing" is a legal concept, and, following *Loper Bright*, this Court must engage in a *de novo* review

of the meaning of the statutory text. 144 S. Ct. at 2261 n.4, 2273.

Further, as we explained above (at 24), the agency's position on what a "filing" means has not been as consistent as the agency suggests. For decades, FDA treated a facially complete filing as filed on "the date on which [the] application [was] received." *See, e.g.*, 39 Fed. Reg. 11,680. It was through the 60-day filing regulation that the agency undertook to tack on 60 days to the statutory 180 days to buy itself more time. FDA's shifting-sands approach thus illustrates the very evils that motivated *Loper Bright*, prompting the Court to make crystal clear that courts must determine the "best"—and only—meaning of the statutory text.

Here, FDA offers no *textual* analysis of the FDCA that would authorize it to enlarge its statutory deadline to act on an application by "deeming" an application filed 60 days after an applicant submits it. An agency interpretation entirely untethered from statutory text does not acquire any special weight simply because it has long deviated from Congress's design. Whatever force such an argument may have had under *Chevron*, *Loper Bright* forecloses the contention. *Loper Bright*, 144 S. Ct. at 2273.

**iii.** FDA's final effort to overcome the statutory text rests on congressional acquiescence. FDA Opp. 31-32. But FDA has come nowhere close to justifying application of such a doctrine. Congress has not implicitly ratified FDA's interpretation of the FDCA as allowing FDA to tack on an extra 60 days to the statutory deadline. As courts in this District have made clear time and again, courts are "loath to replace the plain text and original understanding of a statute with an amended agency interpretation" "absent 'overwhelming evidence'" of congressional acquiescence. *Solid Waste Agency of N. Cook Cnty.*, 531 U.S. at 169 n.5. Indeed, such a finding is generally appropriate only "when there is evidence that Congress considered and rejected the '*precise* issue' presented before the Court." *Rapanos*, 547 U.S. at 750 (quoting *Bob Jones Univ.*, 461 U.S. at 600).

FDA attempts to show congressional acquiescence, but nothing provides "overwhelming

evidence" that Congress authorized FDA to add 60 days onto the statutory deadline.

FDA first argues that when Congress amended the FDCA in 1962 to include the requirement at issue—that FDA approve an NDA or issue an NOOH within 180 days of "the filing"—it operated against a background of FDA regulations "consistently allow[ing] FDA to determine whether an application could be 'accepted for filing.'" FDA Opp. 32. But as we have already explained, the regulatory history preceding the FDCA's 1962 amendment supports *Vanda's* interpretation—not FDA's. Starting as early as 1938, although FDA would "promptly" undertake a "completeness" review of an application, if there were no completeness issues, "the date on which such application is *received* is considered to be the date which such application is *filed*." 21 Fed. Reg. 5,576, 5,579 (July 25, 1956) (prior 21 C.F.R. § 130.5) (emphasis added); 6 Fed. Reg. 1,920, 1,921 (Apr. 15, 1941) (prior 21 C.F.R. § 2.110) (same); 3 Fed. Reg. 3,161, 3,168 (Dec. 28, 1938) (implementing FDCA Section 505(d)); *see also* 39 Fed. Reg. 11,680, 11,726 (Mar. 29, 1974) (prior 21 C.F.R. § 314.110) (same). When Congress amended Section 355(c)(1) in 1962 to require FDA to act on an application within 180 days of the *filing*, it thus "acted against the backdrop of the FDA's consistent" position that a complete application is "filed" when the agency receives it. *Lorillard*, 434 U.S. at 580. And Congress tethered the 180-day to the filing—i.e., the receipt—date, consistent with the commonly understood meaning of the term "file" in the context of the phrase "any person may file with the Secretary." 21 U.S.C. § 355(b)(1)(A), (c)(1). The FDCA nowhere suggested that FDA could place complete applications on ice for an extra 60 days. Instead, it gave FDA 180 days to resolve the application.

FDA also points to a single comment in a House Report accompanying the Hatch-Waxman Act of 1984, which established the abbreviated new drug application process for generic drugs. *See* Pub. L. No. 98-417, 98 Stat. 1585 (1984). That law post-dates the relevant enactment. But in any event, it was not targeted at the process for reviewing new drug applications, and the specific provision FDA emphasizes concerns the calculation of patent-term-extensions to account for

regulatory delays. *See* 35 U.S.C. § 156. Congress was not considering whether to change the procedures applicable to new drug applications to reject or reflect FDA's practices. It is thus not possible based on this statement to show that "Congress considered and rejected the '*precise* issue' presented" here, and such paltry evidence cannot displace "the plain text and original understanding" of Section 355(c)(1). *See Rapanos*, 547 U.S. at 750.

Moreover, the statement FDA cites does not even on its face engage with the *timing* violation that the 60-day filing regulation effects. The House Report distinguished "filed" from "initially submitted," defining the latter to encompass a situation in which "the applicant has made a deliberate effort to submit an application" (H.R. Rep. No. 98-857, 1984 U.S.C.C.A.N. 2647, 2677), to ensure that, even if FDA rejected an application as "incomplete," that wasted regulatory time could still be included in the calculation of a patent-term extension so long as the application was the product of a "deliberate effort" to try. The House Report said nothing even remotely close to approving FDA's practice of adding 60 additional days onto the statutory 180-day deadline for approving a complete application and, thus, it cannot possibly have acquiesced in an interpretation that the statute permits such a practice. For present purposes, though, the burden is on the government to show evidence that is "overwhelming" on this point, and it has come nowhere close.

#### *b. FDA's CRL regulations are inconsistent with Section 355(c)(1).*

The other regulation that FDA uses to extend its statutory deadline to act on an NDA, the CRL rule, fares no better under the FDCA's text. As Vanda explained in its opening brief (at 17-24), the CRL regulation unlawfully replaces the NOOH that FDA is statutorily obligated to provide an applicant within 180 days of filing with something of its own invention—a complete response letter.

The issue could not be more straightforward: The FDCA unambiguously provides that "[w]ithin one hundred and eighty days after the filing of an application … , the Secretary *shall* either … (A) approve the application … or (B) give the applicant notice of an opportunity for a

hearing before the Secretary under subsection (d) on the question whether such application is approvable." 21 U.S.C. § 355(c)(1) (emphasis added). FDA regulations instead provide that the agency will "send the applicant either an approval letter under § 314.105 or a complete response letter under § 314.110" within 180 days of receiving an application. 21 C.F.R. § 314.100(a). Vanda and FDA *agree* that a CRL is not an NOOH. *See* FDA Opp. 35. It is thus impossible to square the FDCA—under which the agency must send *the NOOH* within 180 days—with the CRL regulation—in which the agency sends what is *not* an NOOH after 180 days. The CRL regulation then layers on at least 60 more days of agency delay. The agency will not send an NOOH until (1) the applicant asks and (2) the agency dallies *another* 60 days. 21 C.F.R. § 314.110(b)(3). The regulations are "contrary to [the] statute." *NAACP v. DeVos*, 485 F. Supp. 3d 136, 145 (D.D.C. 2020) (quoting *Orion Reserves Ltd. P'ship v. Salazar,* 553 F.3d 697, 703 (D.C. Cir. 2009)).

Before fully addressing FDA's defense of the CRL regulations, it bears emphasis that FDA assumes the correctness of its argument about PDUFA supplanting Section 355(c)(1) and the validity of the 60-day filing regulation. *See* FDA Opp. 33. But, for the reasons we have already described (*supra* at 10-20, 20-28), PDUFA did not supplant Section 355(c)(1) and the 60-day-filing regulation is irreconcilable with the statute. FDA's argument effectively admits that, without its PDUFA argument or the 60-day filing regulation to delay triggering the statutory 180-day command, FDA cannot defend the CRL process as consistent with the statute.

That aside, however, even the defense FDA does mount can only be described as lackluster; it barely engages with the statutory text at all. Instead, FDA disaggregates each of the offending provisions of the CRL regulation and tries to justify each as independently "reasonable." After *Loper Bright*, the question is not whether FDA's approach is "reasonable"; the question is whether FDA has "acted within its statutory authority" as determined by this Court's "independent judgment." 144 S. Ct. at 2273. At each step, FDA's arguments fall short.

***i. FDA can provide "initial feedback" within the review period but still must provide an NOOH within 180 days of submission.***

The first "step" in FDA's attempt to demonstrate the lawfulness of its CRL regulations begins with a defense of its ability to send "initial feedback." FDA Opp. 33-34. But this attacks a straw man. To be clear: Vanda has never claimed that FDA cannot issue interim feedback during the review process—whether styled as a complete response letter or any other sort of "action letter." Just the opposite—Vanda's opening brief made clear that it "would not object to a properly crafted regulatory scheme that allows developers to withdraw their application prior to receiving an NOOH," and "[t]here may well be good reasons for achieving this outcome." Vanda Br. 22. Vanda maintains only that if FDA devises such a scheme, it must do so in a way that complies with the FDCA. *See id.* Vanda even explained how this could be accomplished: FDA would "decide *before* the statutory deadline expires whether it will approve an application; if it decides it will not, it can inform a manufacturer and explain that an NOOH will be issued on the statutory date, unless the manufacturer withdraws the application or in fact agrees to a deadline extension." *Id.*

FDA's protracted review of its history of sending "action letters prior to issuing an NOOH" and insistence that "Congress has long known of, and ratified" this practice (FDA Opp. 33-34) misses the mark. FDA does not point to *any* evidence—let alone "overwhelming evidence"—to support the assertion that "Congress has … ratified" FDA's interim-feedback regime to override Section 355(c)(1)'s *timing* mandate. To be sure, FDA cites its own promulgations in the Federal Register. *See* FDA Opp. 33-34.[4] But this case concerns whether FDA's interpretation of the

[4] Though immaterial, the prior regulations FDA cites also had a less egregious structure. *See, e.g.*, 28 Fed. Reg. 6,377, 6,381 (June 20, 1962). FDA would issue a notice within 180 days of filing—counted from the date of receipt (*id.* at 6,380)—that stated an intent to issue an NOOH, and then an applicant had 30 days to withdraw, waive, or agree to an additional period to extend the time, adding only 30 days. *Id.* Here, FDA regulations at least more than double that (either

stature comports with *Congress*'s directives.

FDA musters four items that it says shows "Congress has implicitly … ratified FDA's use of action letters." FDA Opp. 35. The phrasing tells it all—Congress's implicit ratification of "action letters" is neither "overwhelming evidence" of ratification nor is it even ratification on the salient point here—about the *timing* Section 355(c)(1) mandates. To take each in turn:

*First*, FDA points to its own regulatory definition of "complete response letter" as "adopt[ing] PDUFA's statutory description of 'action letter.'" FDA Opp. 34. That is an action *by FDA*, not by Congress. It also assumes the correctness of FDA's contention that PDUFA repealed Section 355(c)(1), which is wrong. *See supra* at 10-20.

*Second*, FDA points out that Congress "requires" FDA to send "an approval or a complete response letter to applicants redeeming a priority review voucher." FDA Opp. 34. For this assertion, FDA invokes the priority-review statute, which expressly codifies FDA's existing practices and PDUFA goals. *See* 21 U.S.C. § 360n(a)(1). An express statutory incorporation of FDA's practices for a different program is not "overwhelming evidence" that Congress intended to incorporate FDA's practices into Section 355(c)(1). If anything, it is the opposite—Congress knows how to incorporate FDA's practices and it has not in Section 355(c)(1). In any event, this disregards that Vanda's objection is not to the complete response letter as such—it is to the *timing* that precludes satisfaction of the statutory mandate.

*Third*, FDA says that Congress "requires" FDA to send "an approval or a complete response letter to applicants … seeking approval of a generic drug." FDA Opp. 34. Again, this concerns a different kind of drug application governed by a different statutory scheme (under § 355(j)). But even the provision cited merely addresses what human generic drug fees can be *used for* (*see* 21 U.S.C. § 379j-41(9)(B)(ii))—to avoid FDA diverting user fees to other activities.

---

by adding 60 days to the front for "filing" or 60 days after a hearing is "requested"). *See* 21 C.F.R. §§ 314.101(a)(1), 314.110(b)(3).

Nothing about it mandates the use of CRLs, and it certainly says nothing about the timing required under Section 355(c)(1). Again, Vanda does not object to a CRL—it objects to a structure that precludes adherence with the statutorily-required timeframes.

*Fourth*, FDA says that it committed to creating a "complete response" scheme in a PDUFA letter, and Congress reauthorized PDUFA. But, for all the reasons we have explained, our argument is not that a scheme in which FDA provides a complete-response letter before a final decision is irreconcilable with Section 355(c)(1). Vanda's argument is that such a scheme cannot override Section 355(c)(1)'s *deadline* for issuing the NOOH or approval. The PDUFA letter does not address this at all. *See* AR2499.

On the salient issue—Section 355(c)(1)'s timing—FDA's brief effectively confirms that the CRL regulations do not comply (and thus do not achieve providing "initial" feedback). *See* FDA Opp. 33. That is because, by the time FDA issues a CRL, the statutory deadline to issue an approval or NOOH has expired. The CRL regulations provide that "[w]ithin 180 days of receipt of an application," FDA will send the applicant either an approval or a complete response letter. 21 C.F.R. § 314.100(a).[5] But even following the letter of the regulation—which FDA does not—the 180 days for a CRL is the *same* 180 days the statute provides for sending an approval *or NOOH*. 21 U.S.C. § 355(c)(1)(B). FDA's suggestion that the regulation's time to issuing a CRL is only "120 days" thus assumes that Section 355(c)(1)(B) permits FDA to delay for 60 days at the beginning through the filing regulation, which it does not. *See supra* at 20-28.

FDA also contends that, under 21 C.F.R. § 314.100(c), this "initial time period" can be modified "by mutual agreement between FDA and an applicant or as provided in [regulations governing amendments to applications]." 21 C.F.R. § 314.100(c). FDA then repeats its contention that PDUFA reflects a "mutual agreement between FDA and an applicant" to delay. FDA Opp. 33. For the same reasons PDUFA does not reflect an agreement for purposes of Section

[5] FDA does not follow this regulation; instead, it follows the far longer PDUFA "goals."

355(c)(1)(B), it likewise cannot possibly reflect a "mutual agreement between FDA and an applicant" to delay. *See supra* at 16-19.

While FDA may have the discretion to implement an interim-feedback procedure, it must do so in a way that complies with the FDCA. On that score, the CRL regulations fall far short.

***ii. FDA cannot unilaterally dictate an applicant's agreement to extend its review period.***

FDA's "second step" defends the CRL regulation's unilateral mandate that an applicant "agree[s] to extend the review period until it determines how to proceed with its application." FDA Opp. 36. But the problem is that the rule does not "enable" an applicant to agree to extend FDA's review period—it requires it—and an applicant has no ability to avoid FDA's so-called "flexibility" to obtain an NOOH within the 180 days the statute mandates. 21 C.F.R. § 314.110(c) cannot possibly supply the "agreement" under Section 355(c)(1) for FDA to violate the statutory deadline.

No one disputes that the FDCA allows FDA and a drug applicant to "agree[]" to extend FDA's review period beyond 180 days. 21 U.S.C. § 355(c)(1). But FDA's unilateral mandate that "[a]n applicant agrees to extend" the deadline "until [the applicant] takes" one of the actions specified does not legitimately achieve an extension. 21 C.F.R. § 314.110(c). The plain meaning of "agree" precludes FDA's position. After all, an "agree[ment]" is a "manifestation of mutual assent." *Agreement*, Black's Law Dictionary (11th ed. 2019) (emphasis added); *Agreement*, Black's Law Dictionary (Deluxe 4th ed. 1957) ("a concord of understanding and intention between two or more parties … a mutual obligation"). There is nothing "mutual" about FDA's unilateral pronouncement—the applicant has no say in whether it receives an approval or NOOH within 180 days or whether FDA issues a CRL. *Compare Mutual*, Black's Law Dictionary (11th ed. 2019) ("reciprocally given, received, or exchanged"), *with Unilateral*, Black's Law Dictionary (11th ed. 2019) ("One-sided; relating to only one of two or more persons or things"). Taking one of the three specified actions in 21 C.F.R. § 314.110(b) then provides the agency with *60 more days* to issue an NOOH. None of this resembles a period "agreed upon by the Secretary and the applicant."

21 U.S.C. § 355(c)(1).

Indeed, this case illustrates the utter lack of mutuality. Starting with its sNDA cover letter—the very first paragraph in the very first document the agency would see—Vanda insisted that the agency either issue an approval or an NOOH within 180 days. AR2734. From then, Vanda repeatedly requested approval or an NOOH within the required time. Over and over Vanda reiterated that it did not agree to any delay of the 180-day period. AR2734, AR2947, AR2950, AR2973, AR2977. But FDA, of course, delayed more than 220 days beyond the deadline.

FDA responds with dictionaries of its own, insisting that the CRL rule's unilateral "agreement" is consistent with the word's plain meaning. But the definitions it invokes still support Vanda's position. "[A]n understanding or arrangement *between* two or more people" requires involvement from both parties. *See* FDA Opp. 36 (quoting *Agreement*, Webster's New World Dictionary, College Edition 29 (1962) (emphasis added)). And two parties cannot "be of the same opinion" or "concur" if one party's "opinion" or "concurrence" is disregarded entirely. An applicant may "understand" from FDA's letter that, until it responds, *FDA* will treat its deadline to do anything as extended. But that does not mean the applicant has "agreed" to FDA's view. It is hard to understand how there could be such an agreement when the applicant has repeatedly stated that it does not agree. *E.g.*, AR2734, AR2947, AR2950, AR2973, AR2977.

Nonetheless, FDA endeavors to avoid the plain meaning of "agreement." FDA Opp. 37. While Vanda acknowledges that contract law does not strictly govern the parties' relationship here, the ordinary meaning of "agreed upon" *does*. Fundamental contract principles inform the ordinary meaning of "agreement" and lay bare the CRL regulations' inconsistency with what Congress intended. *See United States v. Honeywell Int'l Inc.*, 47 F. 4th 805, 813 (D.C. Cir. 2022) (courts "presume Congress employs common law terms with their common law meaning, absent a contrary indication in the statute"). As every first-year law student learns the first week, an agreement "requires a bargain in which there is a manifestation of mutual assent." Restatement (Second) of

Contracts § 17 (1981).

FDA's response that an "applicant can 'accept' the offer by refraining from action, or it could 'reject' the offer by, for example, requesting an opportunity for a hearing" (FDA Opp. 37) cannot rehabilitate the regulation. Vanda attempted to reject FDA's offer in its sNDA cover letter—by expressly demanding that FDA issue an approval or a notice of an opportunity for a hearing within 180 days. AR2734; *see also* AR2973 ("Vanda has at least three times by letter and through pending federal litigation informed the Agency of [21 U.S.C. § 355(c)(1)'s statutory requirement and its expectation that it will be followed."). FDA did not honor that. Instead—contrary to Section 355(c)(1)'s direction that an extension of the 180 days applies only if "*agreed upon*" by the applicant and FDA—FDA forces applicants to wait to receive a CRL at the 180-day mark and, at that point, imposes agreement to delay. Vanda sent repeated communications—from its cover letter to correspondence during the review stating that it did not agree to any delay. AR2734, AR2947, AR2950, AR2973, AR2977. FDA signed the CRL at 11:06 p.m. (AR2966), leaving less than 54 minutes to even attempt to avoid a mandated agreement to extend the review period by at least a day.[6] These events illustrate perfectly that FDA's CRL regulation is not in any sense "agreed upon" by the applicant and FDA. Any construction of Section 355(c)(1) that allows FDA to treat Vanda's unfailing insistence that the agency follow the statute as "agreeing" to a delay is utterly untenable.

No one disputes, as FDA suggests, that there may be "benefits" to an extension of time. But the central point remains that the FDA and the applicant must *agree*; FDA cannot mandate such agreement nor can it devise a CRL structure that inevitably violates its obligation under Section 355(c)(1) to issue an NOOH within 180 days. Section 355(c)(1) provides that FDA will

---

[6] FDA chides Vanda for "[t]he ease with which [it] could have declined an extension—*i.e.*, by immediately requesting an NOOH." FDA Opp. 37 n.17. But that would have been literally impossible here when there were only 54 minutes remaining after the CRL was signed to avoid a mandated "agreement" to some extension.

supply an applicant with an NOOH *automatically* by 180 days if FDA is not going to approve the application. FDA's CRL regulation does not even given the applicant a *CRL* until 180 days, mandates agreement to absolve FDA's obligation to issue an NOOH at that date with no ability for an applicant to disagree before the 180 days passes, and then gives the agency 60 more days to issue the NOOH.

It is curious that FDA would endeavor to support its "benefits" argument by citing a case in which Judge Nichols agreed with Vanda that "[t]he FDA has adopted regulations governing [the NDA review] process, which institute a different timeline." *See Vanda Pharms.*, 2024 WL 307287, at *1. That is our point. The CRL regulations—including its "second step" astatutory post-CRL mandated agreement to delay—all combine such that an applicant has literally no ability to receive an NOOH at 180 days. If there are "benefits" to be had, the agency must still provide an applicant with the ability to *agree* it wants those benefits. The structure of FDA's CRL regulations, by unilaterally mandating agreement at the expiration of its 180-day clock, is not "agreement" at all.

***iii. The CRL rules prevent an applicant from receiving an NOOH within the 180 days.***

The "third step" FDA describes is the CRL regulations' requirement that, once an applicant requests an NOOH, FDA will "give the applicant" the NOOH within *another* 60 days. *See* FDA Opp. 38 (citing 21 C.F.R. § 314.110(b)(3)). FDA attempts to salvage this feature of the CRL regulation. But, again, the totality of FDA's scheme falls apart. The CRL regulations' additional 60 days gives the agency *at least* 240 days, rather than the statutory 180 days, to issue an NOOH. That is contrary to Section 355(c)(1).

First, FDA defends the CRL regulations because the text of 21 C.F.R. § 314.100 says a CRL will issue within 180 days of receipt of the application. But that is incomplete. The regulation actually says—under FDA's interpretation—that a CRL will issue on the PDUFA goal deadline, which is 10 or 12 months after receipt. It does so, according to FDA, by incorporating

"paragraph (c)," which in turn provides that the "initial review cycle may be adjusted by mutual agreement between FDA and an applicant" (*id.* § 314.100(c)), which FDA interpreted in the CRL regulation preamble to mean the PDUFA goals (Applications for Approval to Market a New Drug; Complete Response Letter, 73 Fed. Reg. 39,588, 39,589 (July 10, 2008) ("Adjustment of the initial review cycle to fewer or greater than 180 days for human drug applications and supplements, accepted by mutual agreement between industry and FDA under the agency's user fee performance goals, is provided for under the adjustment by mutual agreement provision in revised § 314.100(c)."). FDA's defense of the validity of its CRL regulations as satisfying the 180 days defies credulity when in the same breath it overwrote the 180 days with PDUFA goals.

Second, even on the letter of the CRL regulations, FDA still cannot save them. FDA now tells us that the CRL regulation requires providing the NOOH within 180 days of "receipt of an application" and that "receipt" means when the applications enters the agency's possession (rather than when it is "filed"). FDA thus contends that the CRL regulations comply with the statutory 180 days because the statute does not start counting until day 60 (by operation of the filing regulation), the CRL would (theoretically) issue at statutory day 120 (180 days after "receipt"), the applicant agrees to extend the review period until it requests an NOOH, and then FDA "gives the applicant" the NOOH 60 days later. FDA Opp. 38.

The math is clever, but the filing regulation is invalid, as we have already explained. *See supra* at 20-28. The statute starts counting when the application arrives, and FDA's regulation states that a *CRL* issues at day 180. The CRL regulation then tacks on at *minimum* 60 more days for the agency to issue the NOOH. That equals 240 days—well more than 180. The 60 additional days under the CRL regulation to issue the NOOH is invalid too.

* * *

FDA's efforts to justify its regulations are interesting to be sure. But FDA's post-hoc numbers game to turn its delays into 180 days is specious. In reality, the agency does not see itself as

bound by the FDCA's timing requirements at all, and it has erected a scheme of regulations and practices that denied Vanda its NOOH for *400 days*.

**C. A declaratory-relief remedy is imperative.**

FDA's issuance of Vanda's NOOH after 400 days—well more than double the statutory period—clearly violated Section 355(c)(1). To remedy FDA's clear statutory violations of Section 355(c)(1) in reviewing this sNDA—indeed, *all* of Vanda's drug applications—the Court should order declaratory relief declaring FDA's delay unlawful, including FDA's application of the 60-day-filing regulation and the CRL regulations, which enabled this unlawful delay.

Before explaining why declaratory relief is appropriate, we note that FDA's reliance on the *TRAC* factors (at 39-45) to refute Vanda's claim of unlawful agency inaction is misplaced. Because Vanda concedes that FDA mooted Vanda's requests for injunctive and mandamus relief by (finally) issuing an NOOH, the *TRAC* factors have no more role to play in this case. Those factors do not bear on whether an agency has acted *lawfully*, but rather whether judicial injunctive intervention is appropriate to compel the delayed or withheld act. *See In re Barr Lab'ys*, 930 F.2d at 74 ("*TRAC* … help[s] courts determine when mandamus is an appropriate *remedy* for agency delay" (emphasis added)); *id.* ("The issue before us, then, is not whether the FDA's sluggishness has violated a statutory mandate—it has—but whether we should exercise our equitable powers to enforce the deadline."). FDA's extended discussion of the *TRAC* factors is thus fully beside the point. In light of FDA's transparent effort to moot the litigation by issuing an NOOH (in violation of the very regulation FDA now defends here because Vanda did *not* request one), Vanda asks that the Court "decide all relevant questions of law [and] interpret constitutional and statutory provisions" to award it declaratory relief. 5 U.S.C. § 706.

Turning to Vanda's request for declaratory relief, and as we explained previously (Vanda Br. 27-28), FDA did not moot Vanda's request for declaratory relief by issuing the NOOH because Vanda "seeks declaratory relief as to an ongoing policy." *Del Monte Fresh Produce Co. v. United*

*States*, 570 F.3d 316, 321 (D.C. Cir. 2009). And a challenge to "both a specific agency action and the *policy* that underlies that action" does not become moot even if "the challenge to the particular agency action is moot." *City of Houston, Tex. v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1428 (D.C. Cir. 1994); *see also Del Monte*, 570 F.3d at 321 ("[A] plaintiff's challenge will not be moot where it seeks declaratory relief as to an ongoing policy"); *Centra Med. Grp., LLC v. USCIS*, 2022 WL 910348, at *5 (D.D.C. Mar. 29, 2022) ("[I]t is well-established that if a plaintiff challenges both a specific agency action and the policy that underlies that action, the challenge to the policy is not necessarily mooted merely because the challenge to the particular agency action is moot.") (citing *City of Houston*, 24 F.3d at 1428)). Indeed, "*whenever* a party challenges the regulatory basis for a sanction it necessarily challenges the future effect of the regulation." *Lutheran Church-Missouri Synod v. FCC*, 154 F.3d 487, 490 (D.C. Cir. 1998) (emphasis added).

Here, FDA clearly violated Section 355(c)(1). It published an NOOH after *400 days*, not the 180 days the statute required. The Court should declare this unlawful. In the course of violating Section 355(c)(1), FDA applied to Vanda its practice of adhering *only* to PDUFA (as its brief now admits), its 60-day filing regulation, and its CRL regulations to unlawfully withhold timely action on Vanda's sNDA. Declaratory relief is warranted to declare Vanda's rights under Section 355(c)(1).

Other general mootness exceptions similarly confirm the propriety of declaratory relief. The violation that happened with this sNDA is "capable of repetition, yet evading review" and the NOOH that FDA issued was a "voluntary cessation" of the challenged conduct. *See Del Monte*, 570 F.3d at 321-322 (mootness inapplicable where violation is "capable of repetition, yet evading review"); *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) ("[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.").

While FDA does not appear to dispute that Vanda's request for declaratory relief is not

moot in the Article III sense, the reason why courts will not find mootness when the violation is capable of repetition, yet evading review is instructive. After all, "[t]he government cannot escape the pitfalls of litigation by simply giving in to a plaintiff's individual claim without renouncing the challenged policy, at least where there is a reasonable chance of the dispute arising again between the government and the same plaintiff." *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 74 F.3d 1308, 1311 (D.C. Cir. 1996), *vacated on other grounds*, 519 U.S. 1 (1996).

Likewise, the voluntary-cessation doctrine recognizes that "'agency actions of less than two years' duration cannot be 'fully litigated' prior to cessation or expiration." *Del Monte*, 570 F.3d at 322; *see also United Bhd. of Carpenters & Joiners of Am. v. Operative Plasterers' & Cement Masons' Int'l Ass'n*, 721 F.3d 678, 688 (D.C. Cir. 2013). FDA's delays evade review because—although the delay is unlawful—the agency generally does act before any litigation can be fully resolved. And there is every likelihood that Vanda will again be subject to same wrong. *Del Monte*, 670 F.3d at 324 (claim for delay in issuing license was not mooted by issuance of the license, because plaintiff's "ongoing commercial enterprise" required future licenses from OFAC and evidence suggested continued delays). Declaratory relief is thus crucial here, as FDA is otherwise positioned to repeat its unlawful behavior *again* with respect to other of Vanda's pending and forthcoming applications. *See* Vanda Br. 5 n.3. If Vanda must again challenge FDA's delay, declaratory relief here would at least put an end to the parties having to litigate the validity of FDA's regulations. When FDA unlawfully delays agency action again in the future and Vanda must seek judicial intervention, the substance of the dispute will be resolved, and courts will need only decide whether to step in to compel the agency action (unless FDA were to moot the request for injunctive relief). *See Vanda Pharms.*, 2024 WL 307387, at *3.

FDA has not offered a compelling basis to deny relief here. First, whatever might be said of unlawful delay claims generally, Vanda's claims here are not "highly fact-specific," as

substantially reflected by this filing. *See* FDA Opp. 40 (quoting *PETA v. Gittens*, 396 F. 3d 416, 424 (D.C. Cir. 2005)). Vanda argues that FDA's regulations are contrary to the FDCA, and thus the agency may not apply those regulations to its drug applications.

The Supreme Court's decision in *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004), does not, as FDA argues (at 40), preclude Vanda from attacking FDA's regulations, as it has done here. FDA mischaracterizes *Norton*, which merely clarifies that "706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take" and "rules out judicial direction of even discrete agency action that is not demanded by law." *Id.* at 64-65. Vanda's claims fit squarely within those parameters, as Vanda contends that FDA unlawfully delayed in issuing the NOOH it was *legally required to provide*. 21 U.S.C. § 355(c)(1)(B). That FDA delayed this discrete action because of unlawful regulations—under which the agency systematically delays acting on NDAs and will continue to do so for Vanda's future applications—makes declaratory relief more appropriate, not less.

The Court should not be threatened by FDA's claim (at 40) that Vanda's argument, if successful, would "upend the regime by which FDA has regulated a trillion-dollar industry for decades." To start with, FDA's assertion (at 40) that Vanda's "remedy is legislative, not judicial" is farcical: Vanda's remedy is asking a Court to identify what the governing statute *requires*. Courts have already done so—in *Sandoz*, *Barr*, and even in *Vanda*. Now, *Vanda* wishes to have that established law apply clearly to it, to govern its current and future interactions with FDA. FDA cannot seriously maintain that, in the face of an apparent deviation from the statute, a regulated entity's remedy lies not with the judiciary, but instead with Congress. Rather, Congress has *already* spoken—all that remains is recognizing that FDA's actions here depart from that clear law.

If FDA truly means to say that it cannot comply with the statute as written—given that PDUFA is designed to allow FDA to set user fees to ensure that it *can* comply with the statutory requirement, the Court should be deeply skeptical of that claim—regardless, it is *FDA* who must

go to Congress to seek amendment to the statute. The Court should reject FDA's naked plea that the Court ignore its statutory violations, leaving Vanda without any remedy.

To be sure, judicial relief for *Vanda* will not facially invalidate the underlying regulations. Ideally, FDA will agree to comply with the law broadly moving forward. But if it does not, it will be left to other manufacturers whether to bring actions to enforce their own rights. For present purposes, though, it is plainly established that Vanda will continue to be injured by application of FDA's unlawful regulations, and thus a judgment declaring FDA's application of its regulations to Vanda unlawful will have substantial, meaningful consequences.

For these reasons, the Court should order declaratory relief for Vanda.

## CONCLUSION

The Court should grant Vanda's motion for summary judgment and issue an order declaring that FDA's failure to provide an approval or NOOH within 180 days of receipt of an application is unlawful and that application of FDA's CRL and 60-day filing regulations to Vanda is unlawful.

Dated: August 7, 2024

Respectfully submitted,

/s/ *Paul W. Hughes*
Paul W. Hughes (D.C. Bar No. 997235)
Sarah P. Hogarth (D.C. Bar No. 1033884)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

*Attorneys for Plaintiff*
*Vanda Pharmaceuticals Inc.*